## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRONT RANGE EQUINE RESCUE, P.O. Box 458, Ocala, FL 34474,<br><br>      Plaintiff,<br><br>v.<br><br>TOM VILSACK, in his official capacity as Secretary of the U.S. Department of Agriculture, 1400 Independence Ave., S.W., Washington, DC 20250;<br><br>RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service, 1400 Independence Ave., S.W., Washington, DC 20250;<br><br>WILLIAM DUNKELBERGER, in his official capacity as Forest Supervisor, Intermountain Region, U.S. Forest Service, 1200 Franklin Way, Sparks, NV 89431;<br><br>DEB HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior, 1849 C Street N.W., Washington, DC 20240;<br><br>TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, 1849 C Street NW, Washington, DC 20240;<br><br>ANGELITA BULLETTS, in her official capacity as the District Manager, Southern Nevada District, Bureau of Land Management, 4701 North Torrey Pines Drive, Las Vegas, NV 89130,<br><br>      Defendants. | Case No. 1:22-cv-2471<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

1.      The U.S. Forest Service ("USFS" or "Forest Service") and Bureau of Land Management ("BLM") are legally mandated under the Wild Free-Roaming Horses and Burros Act, 16 U.S.C § 1331 *et seq.* ("Wild Horse Act") to protect and preserve the wild horses and burros of the Spring Mountain Wild Horse & Burro Complex Herd Management Area ("Spring Mountain HMA"), which is located in the Spring Mountain National Recreation Area (the "Spring Mountain Herd" or "Herd").[1]  In violation of those core responsibilities, in the BLM's May 10, 2022 Decision Record and the USFS's August 2, 2022 Decision Notice (collectively referred to herein as the "Decisions"), the interdisciplinary Proposed Action includes dangerous surgical sterilization of both male and female wild horses and burros.

2.      The USFS/BLM's plans to conduct experimental sterilizations on the Spring Mountain Herd are unjustified, unsupported, unnecessary, and will cause unacceptable harassment, harm, and potentially death of the very animals that the agencies are statutorily obligated to protect.

3.      The USFS/BLM's decisions to employ such population growth suppression methods as surgical sterilization are arbitrary and capricious and in violation of federal law. Alternative, nonsurgical, less invasive, and less risky fertility control tools are available, and already have proven successful in managing wild horse populations throughout the United States.

4.      Plaintiff Front Range Equine Rescue ("FRER") seeks a declaration from this Court that the Decisions to use certain population growth suppression methods that include surgical sterilizations are arbitrary and capricious and should be set aside for violating the Administrative Procedure Act ("APA"), 5 U.S.C § 702 and the Wild Horse Act.  FRER further seeks an injunction

---

[1] For purposes of this Complaint, use of the term "Spring Mountain Herd" applies to both wild horses and burros who reside in the Spring Mountain HMA.

to prevent the USFS and BLM from moving forward with any wild horse and burro sterilization program.  Finally, FRER seeks a declaration that the USFS's and BLM's failures to adequately consider the environmental impacts of surgical sterilization violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C § 702.

6.      Venue is proper in this District under 28 U.S.C. § 1391 because defendants Department of Interior and U.S. Department of Agriculture, the parent agencies ultimately responsible for the Decisions at issue, are located in Washington, D.C., and because the Decisions have nationwide implications that make judicial review in this forum appropriate.  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. § 2201, *et seq.*  This Court may review Defendants' actions and order appropriate relief under the APA, the Wild Horse Act, and NEPA.

## PARTIES

7.      FRER is a nonprofit group incorporated in the state of Colorado under Section 501(c)(3) of the Internal Revenue Code.  FRER operates in Colorado along with a second location headquartered in Ocala, FL.

8.      FRER is dedicated to stopping cruelty and abuse of wild and domestic horses through rescue and education and to protecting wild horses and burros from unlawful gathers and removals from public lands.

9.      As an organization, FRER has fundamental interests and investments in seeing wild horses and burros remain free roaming on public lands and is actively involved in preventing

2

unnecessary roundups or removals of wild horses and burros from their native lands, and in preventing the use of unsafe, untested, and unreliable methods to control fertility.

10.     In carrying out its organizational purposes, FRER has rehabilitated, rescued, and assisted with adoption to good homes thousands of wild and domestic horses.

11.     FRER has been actively involved in reviewing and calling out deficiencies in the USFS's and BLM's prior plans to engage in similarly dangerous and unproductive fertility control methods and sterilization experiments on wild horses and burros as those that are the subject of this action.

12.     For many years, FRER has expended extensive resources, and diverted funds from its other programs, in order to monitor the USFS's and BLM's treatment of wild horses and burros, and specifically the agencies' repeated efforts to engage in illegal and untested medical research experiments on the animals the agencies are obligated to protect from just such dangerous activities.

13.     The USFS/BLM's planned use of population growth suppression methods such as surgical sterilization is antithetical to the mission of FRER to ensure humane treatment for wild horses and burros and will directly harm the organization's ability to further its mission.

14.     If carried out, the planned population growth suppression methods will subvert and frustrate FRER's mission to protect wild horses and burros, to provide them with the most appropriate form of fertility control, and to avoid permanent and dangerous procedures.

15.     A court order declaring unlawful the USFS/BLM's plans to perform invasive and unnecessary surgeries on wild horses and burros captured from the Spring Mountain HMA would protect FRER's interests in the humane treatment, safety and continued health and viability of

wild, free-roaming herds of horses and burros and will allow FRER to dedicate its limited resources to other wild horse and burro conservation programs that are part of its mission.

16.     Defendant Tom Vilsack is Secretary of the U.S. Department of Agriculture ("USDA"), the parent agency for the USFS, and is ultimately responsible for the Spring Mountain Herd and USFS's Decision.  He is sued in his official capacity.

17.     Defendant Randy Moore is Chief of the USFS and is responsible for the Spring Mountain Herd and USFS's Decision.  The USFS is an agency within USDA that is responsible in part for the protection and management of wild horses under the Wild Horse Act.  The Wild Horse Act authorizes USFS to maintain ranges on public lands as sanctuaries for the protection and preservation of wild horses.  16 U.S.C. § 1333.  He is sued in his official capacity.

18.     Defendant William Dunkelberger is the USFS Forest Supervisor of the Intermountain Region.  He is charged with managing the public land and resources of the Spring Mountain HMA in accordance and compliance with federal laws and regulations.  He is sued in his official capacity.

19.     Defendant Deb Haaland is Secretary of the U.S. Department of the Interior ("DOI"), the parent agency for the BLM, and is ultimately responsible for the Spring Mountain Herd and BLM's Decision.  She is sued in her official capacity.

20.     Defendant Tracy Stone Manning is Director of the BLM and is responsible for the Spring Mountain Herd and BLM's Decision.  The BLM is an agency within DOI that is responsible in part for the protection and management of wild horses under the Wild Horse Act.  The Wild Horse Act authorizes BLM to maintain ranges on public lands as sanctuaries for the protection and preservation of wild horses.  16 U.S.C. § 1333.  She is sued in her official capacity.

21.     Defendant Angelita Bulletts is the BLM District Manager for the Southern District of Nevada.  She is charged with managing the public land and resources of the Spring Mountain HMA in accordance and compliance with federal laws and regulations.  She is sued in her official capacity.

## BACKGROUND

22.     Within Clark and Nye Counties, Nevada, the Spring Mountain Complex (the "Complex"), comprises 784,325 acres of USFS and BLM public lands.  (Spring Mountain Wild Horse & Burro Complex Herd Management Area Plan – Final Environmental Assessment ("Final EA") at 1.)

23.     In 1993, the USFS and BLM developed an interagency agreement for lands within the three Joint Management Areas ("JMAs") in the Complex.  (Final EA at 1.)  The agreement gave BLM responsibility for implementing the JMAs for the Red Rock Wild Horse and Burro Territory ("WHBT") (Red Rock and Potosi Mountain Herd Management Areas) and the Johnnie WHBT (Mount Stirling and Last Chance Herd Management Areas) and the USFS had responsibility for the JMA for the Spring Mountain WHBT and Wheeler HMA.  (*Id*.)  Under the agreement, both the BLM and the USFS are required to report the Appropriate Management Levels ("AMLs") of wild horses and burros for the entire Complex; historically, this has resulted in inconsistent AMLs across the two agencies.  *Id*.

24.     The Final EA, Table 1, depicts the current AMLs for each of the JMAs by agency.

| JMA | USFS AMLs set by 1996 SMNRA GMP | | BLM AMLs set by 2004 & 2005 Decisions | |
|---|---|---|---|---|
| | Horse AML | Burro AML | Horse AML | Burro AML |
| Red Rock | 50 | 50 | 16-27 | 29-49 |
| Spring Mtn/Wheeler Pass | 47 | 20 | 47-66 | 20-35 |
| Johnnie | 50 | 75 | 0 | 54-108 |
| Total | 147 | 145 | 63-93 | 103-192 |

25.     The USFS/BLM's Proposed Action, Alternative 1, is to implement a new Herd Management Area Plan ("HMAP"), which, according to the agencies, would reaffirm or adjust AMLs based on "analysis of population inventory, resource monitoring, and other current available data and information." (Final EA at 5.) The Final EA, Table 3, depicts the Proposed AMLs for each of the JMAs.

| JMA | Proposed AMLs | | Forage Allocation at Upper AML | |
|---|---|---|---|---|
| | Horses | Burros | Horses | Burros |
| Red Rock | 16-27 | 29-49 | 324 AUM | 294 AUM |
| Spring Mtn/Wheeler Pass | 47-66 | 20-35 | 792 AUM | 210 AUM |
| Johnnie | 14-34 | 54-108 | 402 AUM | 648 AUM |

26.     Alternative 1 further contemplates the surgical sterilization of both male and female wild horses and burros through castration/gelding and spaying procedures. (Final EA at 7.)

27.     The only other Alternative contemplated by the Final EA is Alternative 2, which constitutes the "no action" alternative.

## LEGAL FRAMEWORK

### *ADMINISTRATIVE PROCEDURE ACT (APA)*

28.     The APA provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action.  5 U.S.C § 702.

29.     The APA authorizes the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (C), and (D).

30.     If a federal agency such as the USFS or BLM implements a new position which deviates from the status quo, the new policy is deemed arbitrary or capricious unless the agency displays awareness that it has changed its policy and provides a reasoned explanation for why it believes the new policy is better than its previous position.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### *NATIONAL ENVIRONMENTAL POLICY ACT*

31.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a).

32.     In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances[.]" 42 U.S.C. § 4331.

33.     In order to carry out the congressional declaration of NEPA's policy, the Federal Government is continually responsible to "fulfill the responsibilities of each generation as trustee

of the environment for succeeding generations; assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings; attain the widest range of beneficial uses of the environment without . . . undesirable and unintended consequences; [and] preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice."  42 U.S.C. § 4331(b)(1)-(4).

34.    NEPA's purposes encompass "[promoting] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" and "[establishing] a Council on Environmental Quality" ("CEQ") charged with "formulat[ing] and recommend[ing] national policies to promote the improvement of the quality of the environment." 42 U.S.C. §§ 4321, 4342.

35.    The CEQ regulations implementing NEPA mandate that "[f]ederal agencies. . . use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  40 C.F.R. § 1500.1.

36.    CEQ regulations define the term "major federal action:"

"Major Federal action" may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals. . . .

40 C.F.R. § 1508.1(q)(2).

37.    Where an agency is invoking a new procedure or program, such as the proposed sterilization action here, NEPA review is required before that program can be invoked.

38.     An environmental "effect" is defined in CEQ regulations to encompass both direct and indirect effects and impacts, including but not limited to ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative.  40 C.F.R. § 1508.1(g).

39.     NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is referred to as the Environmental Impact Statement ("EIS").

40.     An EIS ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.  *Id*.

41.     Where the significance of environmental effects is unclear, the agency may first prepare an EA, which must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact (FONSI)."  40 C.F.R. § 1501.5.

42.     Federal agencies must carefully consider relevant detailed information concerning significant environmental impacts and share that information with the pubic in the Environmental Assessment.  NEPA procedures must ensure that federal agencies have considered relevant environmental information and that the public has been informed before decisions are made and before actions are taken.  40 C.F.R. § 1500.1.

## WILD FREE-ROAMING HORSES AND BURROS ACT

43.     In 1971, Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."  16 U.S.C. §§ 1331 *et seq*.

44.     The Wild Horse Act provides, *inter alia*, that viable herds of wild horses should remain on the lands on which they were found at the time the Wild Horse Act was passed, "as an integral part of the natural system of the public lands."  *Id.*  That is, barring compelling reasons to the contrary, wild horses are entitled to stay in their "herd area" — the "geographic area identified as having been used by a herd as its habitat in 1971."  43 C.F.R. § 4700.0-5(d).

45.     Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose of management and protection."  16 U.S.C. § 1333(a).

46.     The U.S. government has established "Herd Management Areas" ("HMAs") — the geographic areas defined for the maintenance of wild horse and burro herds.  43 C.F.R. § 4710.3-1.  The Spring Mountain HMA is one such area defined for the maintenance of wild horses.

47.     Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose of management and protection."  16 U.S.C. § 1333(a).

48.     Congress requires the agencies involved to preserve and safeguard the horses in a manner that causes the horses the least amount of interference.  The Wild Horse Act provides that "[a]ll management activities shall be at the minimal feasible level . . . in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species."  *Id.*

10

49.     If USFS or BLM determines, based on reliable information, that there is an "overpopulation" of wild horses on public land, and only if the removal of "excess" animals is necessary, the agency is entitled to remove them.  *Id*. § 1332(b)(2).  The agency can only take animals out of the herd who "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  *Id*. § 1332(f) (emphasis added).

50.     The Wild Horse Act does not allow the federal government to use wild horses or burros as medical research subjects in inappropriate surgical sterilization.  "Treating a wild horse or burro inhumanely" – which would include using them as specimens for an experimental surgery and subjecting them to the unknown harms inherent in such practices – is prohibited conduct.  43 C.F.R. § 4770.1(f).  While "sterilization" is an option for the USFS and BLM under the Wild Horse Act, the USFS/BLM's intentions to pursue surgical sterilization as proposed in the Decisions are not contemplated by the Act because the nature of surgical sterilization, castrating/gelding and spaying, is not the minimal feasible alternative, inhumane, and threatens the health and safety of the Spring Mountain Herd.

## **FACTS GIVING RISE TO PLAINTIFF'S CLAIMS**

51.     In the Wild Horse Act, Congress charged the USFS and BLM with the "protection, management, and control of wild free-roaming horses and burros on public lands."  16 U.S.C. § 1331 ("wild free-roaming horses and burros . . . are to be considered in the area where presently found, as an integral part of the natural system of the public lands").

52.     The USFS and BLM are charged with acting as the protectors, on behalf of the American people, of wild horses and burros, and must ensure that the actions they take to manage wild horse and burros benefit those animals.

11

53.     The USFS and BLM are required to fulfill this Congressional mandate at the "minimal feasible level" of management.  16 U.S.C. § 1333.  The USFS/BLM's actions must be consistent with the authority and purpose of the Wild Horse Act.  Congress explicitly expressed that the USFS and BLM shall protect wild horses "from capture, branding, harassment or death." *Id*.; 43 C.F.R. § 4700.0-2.  The USFS and BLM also must manage to preserve the animals' "free roaming behavior" and as "self-sustaining populations."  43 C.F.R. § 4700.0-6.  This legislative intent and regulatory command illustrate that preservation of the *natural* state of the herds and the individual animals and ensuring that the horses are not subject to harassment or other unnecessary devices are defendants' core responsibilities under the Wild Horse Act.

54.     On January 1, 2013, the proposal for this Proposed Action was first posted on the Humboldt-Toiyabe National Forest's website, and on June 14, 2013, a 30-day comment day period ensued.  (Final EA at 50.)

55.     On September 29, 2021, the USFS and BLM released the Preliminary EA.  (*Id*.)

56.     In May 2022, the USFS/BLM released the Final EA.  The BLM released its Decision and Finding of No Significant Impact ("FONSI") in May 2022 and the USFS did the same in August 2022.  The Decisions adopted the Purpose and Need & Proposed Acton of the Final EA.  (*Id*.)

57.     As set forth in the Final EA, the USFS and BLM propose, among other actions, to authorize castration/gelding (the surgical removal of testicles) as well as spaying (the surgical removal of ovaries).  (*Id*. at 7.)

58.     Under the Final EA, the animals selected for surgical sterilization will be rounded up, gathered and removed from the range, and segregated before being transported to a private but unidentified veterinarian's facility to undergo the surgical sterilization processes.

### CASTRATION OR GELDING

59.     As with all invasive sterilizations, castration or gelding has risks of complications that include bleeding, swelling, inflammation, edema, infection, peritonitis, hydrocele, penile damage, excessive hemorrhage, and eventration.

60.     Even though serious complications are noted generally hours after surgery, they may occur any time within the first week following surgery, after the horses already have been released back to their HMAs.  Any effort made by the USFS to monitor gelded horses after release would be incomplete and insufficient and could result in animal suffering.

61.     The USFS/BLM describe gelding as a common surgical procedure (Final EA at 7), but such characterization is misleading in the context of this Proposed Action given that wild horses and burros are rarely gelded and released back into the wild.  Accordingly, there are very few relevant studies.

62.     Additionally, the agencies do not identify the veterinarians who will be performing the surgeries, so that there is no guarantee that these individuals will have any experience or qualifications that provide adequate protection for the horses who will have these surgeries done. The failure to identify the operating veterinarians alone renders the Decisions inadequate.

63.     It is apparent from the Final EA that the USFS and BLM have not considered the practical implications of these surgeries for wild stallions and jacks, which, again, should not be restrained for long periods of time or confined in conditions that prevent them from interacting with others from their herd.

### SPAYING

64.      An ovariectomy via colpotomy, the surgical removal of the ovaries without an external incision, amounts to a dangerous, almost barbaric, and still experimental surgery on wild

horses.  During the procedure, mares must be sedated but they cannot be completely anesthetized because they must remain standing.

65.     In a traditional ovariectomy via colpotomy procedure, the surgery is performed "blindly" with the surgeon only able to palpate, but not visualize, the ovaries.  This causes significant risk of injuring, tearing, or removing other structures, or of severing a blood vessel. Intra-abdominal hemorrhage is a real and potentially lethal risk, and the blind nature of the procedure makes such hemorrhage difficult if not impossible to detect– at least until it may be too late.

66.     Another identified risk is that, in reaching for the ovaries, the veterinarian may believe that other structures (*e.g.*, a ball of feces formed in the large intestine) are the mare's ovaries.  In that event, the veterinarian could cut open the intestines, almost guaranteeing spillage of feces into the abdominal cavity, with the inevitable consequence of fatal septic peritonitis – a painful and torturous death.

67.     The health and behavioral effects of spaying wild horses that live with other wild horses is mostly unknown and not well documented because wild horses have rarely been spayed and released back into the wild.  The USFS/BLM's employment of these untested surgical sterilizations, combined with the release of these horses, could have irreparable impacts on the spayed horses' herd membership and family structures.

68.     Flank laparoscopy is also dangerous and untested here.  It is a surgical procedure that involves creating incisions on the animal's flank through which narrow surgical equipment is used to remove the ovaries.

69.     As with colpotomies, for this procedure mares are sedated but not completely anesthetized because they must remain standing.

70.     Even though flank laparoscopy is considered a lower risk method than ovariectomy via colpotomoy in terms of mortality and morbidity, because of its long surgical duration and its requirement that the mare remain still during operation, its success in domestic mares is unlikely to apply to a wild horse population.  Unlike domestic horses, wild horses cannot and should not be restrained for long periods of time or confined in conditions that prevent them from interacting with other horses.

### THE EXISTING POLICY: PZP

71.     A humane and scientifically-proven alternative — the administration of Porcine Zona Pellucida (PZP) vaccine — is already used by, and available to the USFS and BLM.  PZP is an effective and safe tool which is used to decrease reproduction and reduce wild populations.  In contrast to the dangerous and experimental surgical procedures proposed in the Final EA, the PZP vaccine/contraceptive's application to wild horses and burros *has* been thoroughly studied and proven effective in managing population growth and ensures the animals' ability to remain in their habitat, free from surgical excisions, harassment, and harm, maintaining their free-roaming nature, and in a self-sufficient population.

72.     PZP is noninvasive.

73.     PZP can be administered by trained volunteers or field technicians who are ready, willing, and able to assist.

74.     The use of PZP does not require the destruction of vital equine organs.

75.     The use of PZP does not have the potential to cause hemorrhage, internal injury, or death.

76.     The use of PZP does not require that wild horses be permanently removed from the range or separated from their families.

77.     The use of PZP has less detrimental effect on wild horses and burros than permanently removing the animals' reproductive organs.

78.     PZP has been proven effective, has very few dangers, and does not threaten the lives of the horses or subject them to unnecessary surgery or surgical methods that do not meet contemporary standards of care.

<u>**CLAIMS FOR RELIEF**</u>
<u>**COUNT ONE**</u>

***(VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)***

79.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

80.     By authorizing Alternative 1 of the Proposed Action and surgical sterilization, Defendants have abused their discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

81.     Each and every one of these actions and omissions has injured and damaged FRER as set forth above.

82.     Because Defendants' Proposed Action of surgical sterilization violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the APA.  Accordingly, the USFS/BLM's Proposed Action of surgical sterilization should be declared unlawful, and the Final EA, Decision, and FONSIs should be vacated.

## COUNT TWO

### (*VIOLATION OF THE WILD FREE-ROAMING HORSES AND BURROS ACT*)

83.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

84.    Defendants' determination to pursue surgical sterilization is unnecessary given the availability of an effective, safer, reversible alternative in PZP and other proven safe and humane fertility control vaccines and therefore violates the Wild Horse Act's requirement that Defendants' management activities "shall be set at the minimal feasible level." 16 U.S.C. §1333(a).

85.    Defendants' decision to implement the inhumane procedures of surgical sterilization violates their duties under the Wild Horse Act.

86.    In implementing the decision to conduct surgical sterilization, the USFS and BLM have determined that they prefer surgical sterilization over existing population controls such as PZP and other proven safe and humane fertility control vaccines, because it will make it easier for the USFS and BLM to manage the wild horse population.

87.    Defendants have violated the Administrative Procedure Act and the Wild Horse Act because they have failed to adequately consider less risky alternatives and the lasting and potentially dangerous impacts of surgical sterilization.

88.    Because surgical sterilization will result in highly invasive and irreversible procedure, it is by definition not the "minimum feasible level" of care for wild horses and burros.

89.    Defendants' determination to pursue surgical sterilization additionally violates the Wild Horse Act's requirement that "free roaming horses . . . shall be protected from capture and harassment" and Defendants' own requirement that these wild horses and burros be managed in "self-sustaining populations of healthy animals."

90.    Each and every one of these actions and omissions has injured and damaged FRER

as set forth above.

91.     Because Defendants' Proposed Action of surgical sterilization violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the Wild Horse Act.  Accordingly, the Proposed Action of surgical sterilization should be declared unlawful, and the FINAL EA, Decision, and FONSIs should be vacated.

## COUNT THREE

### (VIOLATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT)

92.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

93.     By authorizing surgical sterilization without first conducting an environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C) *et seq.*, and by issuing FONSIs concluding that their actions could not possibly have any significant impacts, Defendants have violated NEPA and CEQ's implementing regulations, and have acted arbitrarily and capriciously, and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq*.

94.     The Final EA and Decision do not fully analyze or account for all the environmental and other impacts that will result as if the agencies pursue the Proposed Action of surgical sterilization experiments and the post-sterilization behavioral.  Without a complete analysis accounting for *all* potential significant impacts, the Final EA and Decision violate NEPA.

95.     The Final EA and Decision do not identify the professionals intended to perform the dangerous and experimental surgeries, in violation of NEPA.

96.     The required EIS specifically must include descriptions and analysis of the following factors, and any alternatives to potentially significant environmental impacts: (i) impacts

of surgical sterilization, as compared to alternatives such as PZP, with full cost comparisons between the Proposed Action, PZP, no action (cost of environmental restoration), and others; (ii) details of the identified, qualified veterinary personnel conducting the surgeries, or effects of conducting surgeries without qualified personnel; and (iii) any irreversible and irretrievable commitments of resources which would be involved in the surgical sterilization should it be implemented.  42 U.S.C. § 4332(C).

97.     By failing to adequately consider the impacts of surgical sterilization on the human environment, and by failing to consider the relevant CEQ factors, Defendants have failed to take the "hard look" at the impacts of their chosen action as required by NEPA.  Accordingly, Defendants' actions and omissions have violated their obligations under NEPA.

98.     Defendants' decision to proceed with the Proposed Action of surgical sterilization before preparing an EIS violates both NEPA and CEQ's regulations as set forth above.

99.     Each of these actions and omissions has injured and damaged FRER as set forth above.

100.     The Proposed Action of surgical sterilization should be declared unlawful, and the FINAL EA, Decision, and FONSIs should be set aside.

## **RELIEF REQUESTED**

Wherefore, FRER respectfully requests that this Honorable Court:

A.     Declare that Defendants have violated the Wild Free-Roaming Horses and Burros Act by authorizing the Proposed Action of surgical sterilization,

B.     Declare that Defendants have violated the Administrative Procedure Act by authorizing the Proposed Action of surgical sterilization and approving the Final EA, Decisions, and FONSIs;

C.      Declare that Defendants have violated the National Environmental Policy Act by authorizing the Proposed Action of surgical sterilization and approving the Final EA, Decisions, and FONSIs;

D.      Enjoin Defendants from carrying out any aspect of the Proposed Action of surgical sterilization or Final EA, Decisions, and FONSIs;

E.      Order the return of any wild horses or burros that have been removed from the Spring Mountain HMA in violation of federal law;

F.      Vacate the Proposed Action of surgical sterilization and the Final EA, Decisions, and FONSIs;

G.      Award Plaintiff its costs and reasonable attorneys' fees; and,

H.      Award Plaintiff any other relief that is just and proper.

Respectfully submitted August 18, 2022

RILEY SAFER HOLMES & CANCILA, LLP

/s/ *Bruce A. Wagman*
Bruce A. Wagman
456 Montgomery St., 16th Fl.
San Francisco, CA 94104
bwagman@rshc-law.com
Telephone:     (415) 275-8540
Facsimile:      (415) 275-8551

*Attorneys for Plaintiff Front Range Equine Rescue* [pro hac vice application pending]