## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRONT RANGE EQUINE RESCUE, P.O. Box 458, Ocala, FL 34474,<br><br>                           Plaintiff,<br><br>v.<br><br>TOM VILSACK, in his official capacity as Secretary of the U.S. Department of Agriculture, 1400 Independence Ave., S.W., Washington, DC 20250;<br><br>RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service, 1400 Independence Ave., S.W., Washington, DC 20250;<br><br>WILLIAM DUNKELBERGER, in his official capacity as Forest Supervisor, Intermountain Region, U.S. Forest Service, 1200 Franklin Way, Sparks, NV 89431;<br><br>DEB HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior, 1849 C Street N.W., Washington, DC 20240;<br><br>TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, 1849 C Street NW, Washington, DC 20240;<br><br>ANGELITA BULLETTS, in her official capacity as the District Manager, Southern Nevada District, Bureau of Land Management, 4701 North Torrey Pines Drive, Las Vegas, NV 89130,<br><br>                           Defendants. | Case No.: 22-cv-02471<br><br><br>**MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

MOTION.................................................................................................................................. 1

MEMORANDUM OF LAW ................................................................................................... 2

   **I.**    INTRODUCTION ................................................................................................. 2

  **II.**    STATEMENT OF FACTS ..................................................................................... 3

 **III.**    STANDARD OF REVIEW .................................................................................... 6

 **IV.**    LEGAL FRAMEWORK ........................................................................................ 8

      A.  The Wild Horse Act and the Government's Legal Obligations................................ 8

      B.  NEPA and the Government's Legal Obligations...................................................... 9

      C.  The Administrative Procedure Act .......................................................................... 12

  **V.**    ARGUMENT ......................................................................................................... 13

      A.  The Proposed Action Violates USFS' and BLM's Obligation to Conduct
Management Activities at the Minimal Feasible Level as Required Under
the Wild Horse Act. ................................................................................................. 13

      B.  The USFS' and BLM's Proposed Action is Highly Controversial, Untested,
and Not Scientifically Supported Under NEPA........................................................ 14

      C.  Reasonable Alternatives Were Not Considered, in Violation of NEPA.................. 17

      D.  The USFS and BLM Failed to Take a Hard Look as Required Under NEPA......... 20

 **VI.**    CONCLUSION...................................................................................................... 22

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Am. Horse Prot. Ass'n, Inc. v. Watt,*
    694 F.2d 1310 (D.C. Cir. 1982) .......................................................................................13

*Am. Rivers v. FERC,*
    895 F.3d 32 (D.C. Cir. 2018) ...........................................................................................10

*Am. Wild Horse Campaign v. Bernhardt,*
    442 F. Supp. 3d 127 (D.D.C. 2020), *aff'd sub nom.*
    *W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021) .................................13

*Baltimore Gas & Elec. Co. v. Natural. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) ............................................................................................................9

*City of Alexandria v. Slater,*
    198 F.3d 862 (D.C. Cir. 1999) .........................................................................................17

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015) .............................................................................................8

*Envtl. Def. v. U.S. Army Corps of Eng'rs,*
    515 F. Supp. 2d 69 (D.D.C. 2007) ...................................................................................21

*Found. on Econ. Trends v. Heckler,*
    756 F.2d 143 (D.C. Cir. 1985) .........................................................................................14

*Humane Soc. of U.S. v. Johanns,*
    520 F. Supp. 2d 8 (D.D.C. 2007) .....................................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................................7

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015) .......................................................................................14

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) .................................................................................................12, 21

*Sierra Club v. Peterson,*
    717 F.2d 1409 (D.C. Cir. 1983) .......................................................................................10

*Sierra Club v. U.S. Army Corps of Engineers,*
    803 F.3d 31 (D.C. Cir. 2015) .............................................................................................9

*Southeast Conference v. Vilsack*,
    684 F. Supp. 2d 135 (D.D.C. 2010) ..................................................................7

*Humane Soc. of U.S. v. Dep't of Com.*,
    432 F. Supp. 2d 4 (D.D.C. 2006) ...........................................................14, 15

**Statutes**

5 U.S.C. § 706 .................................................................................................................7

16 U.S.C. § 1331 ..............................................................................................................8

16 U.S.C. § 1333(a) .......................................................................................................13

16 U.S.C. § 1333(b)(1) ....................................................................................................8

16 U.S.C. § 1333(b)(2) ....................................................................................................8

42 U.S.C. § 4331 ..............................................................................................................9

Council on Environmental Quality Act .......................................................................10

National Environmental Policy Act (42 U.S.C. § 4321 *et seq.*) ...............................1

Wild Free-Roaming Horses and Burros Act (16 U.S.C. § 1333 *et seq.*) ...................1

**Other Authorities**

40 C.F.R. § 1500.1(a) ......................................................................................................9

40 C.F.R. § 1500.1(b) .........................................................................................9, 12, 21

40 C.F.R. §§ 1501.3, 1502.1 .........................................................................................10

40 C.F.R. § 1501.3(b)(2) ...............................................................................................11

40 C.F.R. § 1501.5 .........................................................................................................10

40 C.F.R. § 1506.13 .......................................................................................................10

40 C.F.R. § 1508.1(b) ....................................................................................................11

40 C.F.R. § 1508.1(g) ....................................................................................................11

40 C.F.R. § 1508.27 .................................................................................................11, 12

40 C.F.R. § 1508.27(b)(4), (5) .....................................................................................14

43 C.F.R. § 4710.4 .........................................................................................................13

Federal Rule of Civil Procedure 56 ............................................................................1, 6

*Update to the Regulations Implementing the Procedural Provisions of the*
   *National Environmental Policy Act*, 85 Fed. Reg. 43,304, 43,375, 2020 WL
   4001797 (July 16, 2020) ........................................................................................10

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 7(h), the Administrative Procedure Act ("APA") (5 U.S.C. § 701 *et seq*.), the National Environmental Policy Act ("NEPA") (42 U.S.C. § 4321 *et seq*.), and the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act") (16 U.S.C. § 1333 *et seq.*), Plaintiff Front Range Equine Rescue ("FRER") moves for summary judgment on all claims in its Complaint (ECF No. 1) and seeks an order setting aside the May 10, 2022 Decision of Record of the U.S. Bureau of Land Management ("BLM") and the August 2, 2022 Decision Notice of the U.S. Forest Service ("USFS") (together the "Decisions"), which authorize the population growth suppression activities described in the Spring Mountain Wild Horse and Burro Complex Herd Management Area Plan's Environmental Assessment (the "EA").

For the reasons explained in the Memorandum of Law contained herein, summary judgment in FRER's favor is warranted.  If allowed to stand, the Decisions permit the USFS and BLM (collectively referred to herein as the "Government" or "the Agencies") to perform dangerous surgical sterilizations on male and female wild horses and burros without sufficient justification, evaluation, or understanding of possible consequences, and therefore, in contravention of the law.  In reaching the Decisions, the USFS and BLM have decided to pursue management actions with respect to the wild horses and burros in their care that do not meet the Agencies' mandates to operate their programs at the minimal feasible level of management.  Because of this violation, the Government is certain to cause injury to FRER, and harm and suffering to the individual animals it is supposed to protect, and could impact entire wild horse and burro herds, potentially permanently.  These Decisions also are highly controversial, untested, and not scientifically supported.  The Agencies impermissibly failed to consider viable alternatives and did not take the requisite hard look at the broader environmental impacts of the

Decisions.  If permitted to carry out their Decisions, the USFS and BLM will be violating their legal and statutory duties to protect and preserve the wild horses and burros who live in the Spring Mountain Herd Management Area (the "Spring Mountain Herds" or "Herds").

FRER requests an oral argument on this Motion.

## **MEMORANDUM OF LAW**

### I.     INTRODUCTION

The Secretary of Agriculture, acting through the USFS, and the Secretary of the Interior, acting through the BLM, are responsible for protecting and managing the wild horse and burro populations that live on public lands throughout the U.S.  This action concerns the USFS' and BLM's approved plans to gather, round-up, permanently remove, and most critically for this lawsuit, permanently physically alter, through irreversible dangerous surgical sterilization procedures, wild horses and burros who live in the Spring Mountain Wild Horse and Burro Complex that stretches through Clark and Nye counties in the state of Nevada.  The USFS' and BLM's Proposed Action, as authorized by the Decisions, would include the implementation of the Herd Management Area Plan that calls for a variety of population growth suppression techniques to be used on the Spring Mountain Herds.  The USFS and BLM do not commit to exactly what population growth suppression techniques they will use, but note that such techniques *may* include, but would not be limited to, fertility control vaccines, surgical sterilization, and sex ratio adjustment.  (AR-008042).

In bringing this lawsuit, FRER only seeks this Court's determination that the Agencies' Decision with respect to the most dangerous threatened surgical procedures are illegal because they are in violation of NEPA, the APA and the Wild Horse Act.  FRER seeks a Court order that will stop the USFS and BLM from carrying out those specific types of surgical sterilizations

2

identified here, which can only be described as experimental in nature and which pose the threat

of unnecessary suffering, harm, and even death to horses in the Spring Mountain Herds.

## II.    STATEMENT OF FACTS

The Spring Mountain Wild Horse and Bureau Complex comprises roughly 784,325 acres

of National Forest Service and BLM lands.  (AR-008036).  Within the Complex, there are three

Joint Management Areas ("JMAs"): Red Rock and Johnnie Wild Horse and Bureau Territories

("WHBTs") (over which the BLM serves as lead agency) and the Spring Mountain

WHBT/Wheeler Pass Herd Management Area (over which the U.S. Forest Service is the lead

agency).  (*Id*.).  Since 1993, the USFS and BLM have been operating under an Interagency

Agreement for management of the Spring Mountain Complex, according to which each agency

sets and reports its own AMLs for the entire Complex, including for any JMAs that the other

agency has primary management over.  (*Id*.).  This overlap in oversight has led to historical

variations between the two agencies in how they have calculated the AMLs.  (*Id*.).  Based on

aerial population surveys, the USFS and BLM estimate that as of February 2021, there were

approximately 281 wild horses and 551 wild burros in the Spring Mountain Complex, which are

greater than the controlling AMLs by approximately 1.9 times for wild horses and 2.8 times for

wild burros.  (AR-008037 – AR-008040).

Under the Proposed Action, the USFS and BLM would implement a Horse Management

Area Plan that would adjust the AMLs for wild horses and burros within the effected JMAs.

(AR-008040).  As part of that Plan, the Decision provides the Agencies with a broad list of

certain "adaptive management" tools at its disposal to control wild horse and burro populations.

(*Id*.).  As an initial and then sustained step in the implementation of the Plan, the USFS and BLM

would gather and remove wild horses and burros to achieve horse and burro populations near the

low to mid-range of the adjusted AMLs.  (AR-008041).  The USFS and BLM also would pursue

employing population growth suppression techniques on the Herds.  One such technique includes implementing fertility control vaccines such as porcine zona pellucida and its derivatives ("PZP," "ZonaStat-H," and "PZP-22", referred to collectively herein as "PZP") and Gonadotropin Releasing Hormone and its derivatives ("GnRH" and "GonaCon," referred to collectively here in as "GnRH")[1] that could be applied to any adult mares (female horses) or jennies (female burros) that are captured and released back into the Complex.  (AR-008042).

By this lawsuit, FRER is not challenging any of the above-mentioned population growth suppression techniques.

The other population growth suppression tool that the USFS and BLM seek authority to use through the Proposed Action (and the subject of the lawsuit) is surgical sterilization of both stallions and colts (castration) and mares and jennies (spaying).  (*Id.*).  Surgical sterilizations are not methods used typically by the USFS or BLM in other Herd Management Areas ("HMAs") or on other wild horses under their protection.  Geldings (castrated horses) have been released into herd management areas a handful of times.  (AR-008203).  However, based on the EA, it appears that the only time that female horses and burros on federal lands have ever been surgically sterilized – and the only prior effort cited in the EA – relates to mares on the Sheldon National Wildlife Refuge ("SNWR").[2]  The EA provides no other data and in fact, according to the article published by the veterinarians involved and cited in the EA, almost all of the mares in that project were actually *removed* from the SNWR – not put back on the range as proposed here.

---

[1] While not the subject of FRER's instant challenge, FRER does not by the absence of such a challenge express any support of the use of the GnRH vaccine on wild horses and burros based on similarly scant scientific evidence that it is safe and effective.

[2] The *surgical* sterilization of female horses and burros is far more invasive and dangerous than the simpler procedure of castration in males given the need to enter the pelvic cavity where the ovaries are found.

(AR-08147, citing Collins, G.H. and J.W. Kasbohm. 2016. Population Dynamics and Fertility Control of Feral Horses. The Journal of Wildlife Management, 81:289-296. Doi:10.1002/jwmg.21196).  This one study with minimal results certainly cannot be relied upon to excuse the failure of the Government in this case to consider all facts before it with respect to the dangers of ovariectomy via colpotomy in this population.  Indeed, the EA provides no helpful analysis as to the health or status of those particular mares who were surgically sterilized and left on the range (if any), and the fact that most of them were removed makes the study wholly inapplicable here.  (AR-008042).  The absence of this information is telling, regarding the experimental and potentially dangerous nature of this action, and the Agencies' failure to properly evaluate the facts before them.

Castration or gelding is the irreversible, surgical removal of the testicles.  (AR-008202). Under the Proposed Action, within as few as 72 hours after capture, a veterinarian would perform the surgery using unspecified "appropriate surgical techniques."  (AR-008204).  While castration is a relatively common procedure on *domestic* horses, it has not been widely performed on *wild* horses or burros.  (AR-008202 – AR008210).  Common complications include, but are not limited to "bleeding, swelling, inflammation, edema, infection, peritonitis, hydrocele, penile damage, excessive, hemorrhage, and eventration."  (AR-008204) (internal citation omitted).  The Proposed Action contemplates gelding stallions and colts between the ages of 6 months and 20 years based entirely on the "professional opinion" of the attending veterinarian in consultation with an authorized officer of the agency.  (AR-008204).  "Selected stallions would be shipped to [a] facility, gelded, and returned to the range within 30 days." (AR-008205).  Under the Proposed Action, the USFS and BLM do not commit to *any* monitoring of the impacted geldings after they are released.  (*Id*. ("In the proposed alternatives,

5

gelding is not part of any research study, but additional monitoring on the range *could* be completed either through aerial recon, if available, or field observations from major roads and trails.  *It is not anticipated that all the geldings would be observed*."  (Emphasis added.))).

Of greatest concern to Plaintiff in this action is the fact that the Agencies also seek authority to use two methods to surgically remove reproductive organs of female wild horses and burros: specifically, ovariectomy through colpotomy, or ovariectomy through flank laparoscopy. (AR-008194).  The colpotomy procedure is the most alarming and problematic – it involves the blind surgical severing and removal of the ovaries by unnamed surgeons who cannot visualize the organs they hope to be cutting and extracting.  (*Id*.).  While this procedure has existed for nearly a century, it overwhelmingly has been conducted on non-pregnant, *domestic* horses, and under much more controlled conditions than that contemplated by the Proposed Action.  (*Id*.).

Flank laparoscopy too has been used on *domestic* mares and involves making incisions on the animal's flank to enter the abdomen and sever and remove the ovaries.  (*Id*.).  This procedure requires a "long duration of surgery" but leads to less post-operative rates of complications than the alternative colpotomy method, but the Agencies acknowledge these procedures still may include pain and discomfort.  (AR-008194 – AR-008196).

III.    **STANDARD OF REVIEW**

Under Rule 56(a) of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  When a party seeks a ruling of summary judgment under the APA before a district court, "[s]ummary judgment is [] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record

and is otherwise consistent with the APA standard for review." *Southeast Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

FRER alleges that through their Proposed Action, USFS and BLM have violated the APA, Wild Horse Act, and NEPA.  (ECF No. 1).  A court reviews the Wild Horse Act and NEPA claims under the same judicial review provisions as the APA claims.  *See* 5 U.S.C. § 706. Under the APA, a court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. at § 706(2)(A).  The application of this arbitrary and capricious standard results in a court setting aside any agency action where (1) the agency entirely failed to consider an important aspect of a problem before reaching its decision; (2) the agency offered an explanation for its decision that is contrary to the evidence before the agency; (3) the agency's decision was so implausible that it could not be ascribed to a difference in view or be the product of agency expertise; or (4) the agency's decision was contrary to governing law.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In determining whether to grant summary judgment on an APA challenge, the court must evaluate whether as a matter of law, the evidence in the administrative record permitted the agency to make the decision that it made.  Even though the standard of review for agency action is deferential and narrow, courts will overturn an agency's action where the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, supra*, 463 U.S. at 43 (internal quotation omitted).  Importantly, "an agency cannot 'fail[ ] to consider an important aspect of the problem' or 'offer[ ] an explanation for its decision that runs

counter to the evidence' before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

## IV.    LEGAL FRAMEWORK

### A.    The Wild Horse Act and the Government's Legal Obligations

In enacting the Wild Horse Act, Congress recognized that wild free-roaming horses and burros "are living symbols of the historic and pioneer spirit of the West" and "an integral part of the natural system of the public lands" that "contribute to the diversity of the life forms within the Nation and enrich the lives of the American people." 16 U.S.C. § 1331.  Given their great national importance, the Wild Horse Act was passed to protect these iconic beings from "capture, branding, harassment or death." *Id*.  And the enforcing agencies have been directed that the protection and management of wild horses and burros is to be carried out in a manner that achieves and maintains a thriving natural ecological balance on the public lands. *Id*. at § 1333. To that end, the Government is required to maintain a current inventory of wild horses, to determine "whether and where an overpopulation exists," whether actions should be taken to remove animals, and to "determine appropriate management levels" ("AMLs") of wild horses in each HMA. *Id*. § 1333(b)(1).

The Wild Horse Act permits the USFS and BLM to control wild horse and burro populations and achieve the AML through population growth suppression methods such as fertility controls and sterilization. *Id*. § 1333(b)(2).  However, critically, under the Act, any management actions that the USFS and BLM pursue must be carried out at the "minimal feasible level," meaning with as little disruption to the animals' lives as possible. *Id*. at § 1333(a).  In making management decisions, the USFS and BLM are instructed to consult with federal and state government agencies as well as independent individuals who have scientific expertise and special knowledge of wild horse protection and wildlife management. *Id*. § 1333(b)(1).  In this

way, management decisions are to be carefully made and based on thorough and thoughtful

review of underlying scientific evidence and data.

B.       NEPA and the Government's Legal Obligations

In protecting and managing wild horse and burro populations, the USFS and BLM must

comply with the requirements of NEPA.  42 U.S.C. § 4331.  NEPA "ensure[s] Federal agencies

consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. §

1500.1(a).  Under NEPA, federal agencies like USFS and BLM must "identify and assess in

advance the likely environmental impact of [their] proposed actions".  *Sierra Club v. U.S. Army

Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015) (citing *Dep't of Transp. v. Pub. Citizen*,

541 U.S. 752, 756–57 (2004)).  NEPA "serves the twin purposes of ensuring that (1) agency

decisions include informed and careful consideration of environmental impact, and (2) agencies

inform the public of that impact and enable interested persons to participate in deciding what

projects agencies should approve and under what terms." *Id*. at 36–37 (internal citation omitted).

NEPA accomplishes these purposes by requiring agencies to take a "hard look" at any

environmental consequences of a proposed action before deciding whether and how to proceed.

*Id*.  That is, NEPA obligates an agency "to consider every significant aspect of the environmental

impact of a proposed action," *Baltimore Gas & Elec. Co. v. Natural. Res. Def. Council, Inc.*, 462

U.S. 87, 97 (1983) (internal quotation omitted).  Additionally, NEPA procedures must ensure

that environmental information is identified and considered early in the process and *before*

decisions are made and before actions are taken.  40 C.F.R. § 1500.1(b).

Under NEPA, in the case of "major federal actions significantly affecting the quality of

the human environment," the agency must prepare an environmental impact statement ("EIS")

that must provide "full and fair discussion of significant environmental impacts" to "avoid or

minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. §§

1501.3, 1502.1.  When an agency is uncertain whether a proposed action is likely to have

"significant" environmental effects, instead of preparing an EIS, the agency may prepare an

environmental assessment ("EA"): a concise public document designed to provide sufficient

evidence and analysis for determining whether to prepare an EIS or a "finding of no significant

impact" ("FONSI"), that discusses the purpose and need for the proposed action as well as

suggested and potential alternatives.  40 C.F.R. § 1501.5.  Judicial review should not be "merely

perfunctory," rather, "the Court must ensure that the agency took a hard look at the

environmental consequences of its decision." *Sierra Club v. Peterson*, 717 F.2d 1409, 1413

(D.C. Cir. 1983) (internal quotation marks omitted).  When evaluating whether an agency

discharged its duty by issuing an EA and FONSI, the court considers whether the agency's

NEPA analysis

> (1) identif[ies] accurately the relevant environmental concerns, (2) take[s] a hard
> look at the problem in preparing its [EA], (3) ma[kes] a convincing case for any
> finding of no significant impact, and (4) show[s] why, if there is an impact of true
> significance, there are sufficient changes or safeguards in the project to reduce the
> impact to a minimum, which would obviate the need for an [EIS] entirely.

*Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018).

Additionally, agencies must comply with the regulations adopted by the Council on

Environmental Quality Act ("CEQA") pursuant to NEPA.[3]  Specifically, "[i]n considering

whether the effects of the proposed action are significant, agencies shall analyze the potentially

---

[3] In July 2020, a significant revision was made to the CEQ regulations.  *See Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43,304, 43,375, 2020 WL 4001797 (July 16, 2020).  However, the agency has discretion to continue to apply the repealed regulations for all projects, like this one, that "began" before the effective date of the regulation.  40 C.F.R. § 1506.13.  It appears from the EA that the Agencies are relying on the old regulations (*e.g.* AR-008053), so Plaintiff cites them where appropriate.

affected environment and degree of the effects of the action."[4]  And "[i]n considering the degree

of the effects, agencies should consider … "short- and long-term" and "beneficial and adverse

effects", as well as effects "on public health and safety" and those that would be illegal in the

relevant federal or local jurisdiction.  40 C.F.R. § 1501.3(b)(2).  Under the CEQ rules, effects or

impacts means changes to the human environment[5] from the proposed action or alternatives that

are reasonably foreseeable and include the following:

> (1) Direct effects, which are caused by the action and occur at the same time and place.
>
> (2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.…
>
> (3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non–Federal) or person undertakes such other actions.
>
> (4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative...

40 C.F.R. § 1508.1(g).

The CEQ guidelines help determine whether an action "significantly" affects the

environment, thus triggering the need to prepare an EIS.  *See* 40 C.F.R. § 1508.27.  Whether an

action "significantly" affects the environment requires considerations of both "context" and

"intensity".  *See id.* 40 C.F.R. § 1508.27.  For a site-specific action, such as the impact on the wild

horses of the Spring Mountain Herds, "significance would usually depend upon the effects in the

locale rather than in the world as a whole."  *Id.*

---

[4] "Affecting means will or may have an effect on."  40 C.F.R. § 1508.1(b).

[5] "Human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment."  *Id.* § 1508.1(b).

Relevant considerations include but are not limited to "[t]he degree to which the proposed action affects public health or safety," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id*. Courts have found that the presence of one or more of these CEQ "significance" factors should result in the agency preparing an EIS. *See Humane Soc. of U.S. v. Johanns,* 520 F. Supp. 2d 8, 20 (D.D.C. 2007) (quoting *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 218 (D.D.C.2003)). Agencies must complete the necessary NEPA process *before decisions are made and before actions are taken.* 40 C.F.R. § 1500.1(b). Therefore, "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson,* 490 U.S. at 349.

### C.    The Administrative Procedure Act

The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), provides that "[a] person suffering legal wrong because of agency action, or adversely affected [ ] by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), and (D).

## V.    ARGUMENT

### A.    The Proposed Action Violates USFS' and BLM's Obligation to Conduct Management Activities at the Minimal Feasible Level as Required Under the Wild Horse Act.

The USFS' and BLM's Proposed Action, which includes authority for surgical sterilizations including the barbaric and dangerous ovariectomy via colpotomy, is incongruous with the Agencies' mandate to "protect" wild horses and carry out management responsibilities at the minimal feasible level to achieve a thriving ecological balance between wild horses and burros and other wildlife.  16 U.S.C. § 1333(a).  Carrying out their management activities at the minimal feasible level means the "minimum level necessary to attain the objectives identified in approved land management plans."  43 C.F.R. § 4710.4.  Rather than measure or even materially analyze how less invasive birth control methods such as vaccinations instead of surgical sterilizations – or even safer sterilization procedures – also could achieve the Government's goal of slowing population growth within the Spring Mountain Herds, in the Proposed Action, the USFS and BLM leave open the door to pursue these far more dangerous and invasive methods of surgical sterilization without sufficient justification or consideration of alternatives.  *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 139 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021) (describing "minimal feasible level" to mean "with *as little disruption in the horses' lives as possible*" (emphasis added)); *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1312 (D.C. Cir. 1982) (affirming district court's decision to enjoin BLM from gather of wild horses where BLM violated its mandate of managing at the minimal feasible level by failing to consider all alternative courses of action that would affect the wild horse population less severely than the proposed gather).  Certainly the uncertain, effectively untested, biomedical research upon healthy wild horses, by blindly removing their internal organs, cannot possibly fit within the coverage of "as little disruption" in

13

their lives as possible.  By that fact alone, the Agencies' Decisions to even potentially allow ovariectomy via colpotomy is a violation of their mandate under federal law to protect and preserve these horses, and should be enjoined.

      **B.**    **The USFS' and BLM's Proposed Action is Highly Controversial, Untested, and Not Scientifically Supported Under NEPA.**

Under the Proposed Action, the USFS and BLM would release back to the HMAs some of the wild horses and burros who have been experimented upon with these radical surgical sterilizations (AR-008071), a decision which presents unknown risks that are highly controversial and therefore demanded review under NEPA through an Environmental Impact Statement, to ensure compliance with federal protections.  40 C.F.R. §1508.27(b)(4), (5). Nobody knows how spayed or gelded wild horses or burros will behave when returned to their herds, and so it presents a critical question that should be studied and considered *before* proceeding with the Proposed Action.  *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985) ("NEPA requires the agency to take a 'hard look' at the environmental consequences before taking a major action") (emphasis added) (internal citations omitted).  The USFS and BLM are required to undertake a "fully informed" analysis before pursuing a course of action.  *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324-1325 (D.C. Cir. 2015).  They fail to do that here.  As the Agencies freely admit, how gelded horses will interact with other wild horses has not been adequately studied and presently is largely unknown. (AR-008206, "The behavior of wild horse geldings in the presence of intact stallions has not been well documented … there is relatively little published research on castrates' behaviors") (citing Hart and Jones 1975)).

The Government truly fails in following its statutory obligations with respect to the invasive surgical procedures threatened on the female animals, especially the ovariectomy via

colpotomy, for which there is virtually no careful discussion of the ramifications and real dangers of that procedure.  And where the environmental effects of a proposed action are "highly uncertain or involve unique or unknown risks," an agency must prepare an EIS.  *Humane Soc. of U.S. v. Dep't of Com.*, 432 F. Supp. 2d 4, 13, 21 (D.D.C. 2006) (internal quotation omitted) (granting motion for summary judgment where agency failed to prepare an EIS regarding its issuance of permits for research on endangered sea lions despite agency's recognition of the absence of studies documenting and assessing effects of the research).  And under NEPA, a project is "highly controversial" if there is a "substantial dispute [about] the size, nature, or effect of the major federal action …"  *Id.* at 19 (citing *Town of Cave Creek, Ariz. v. FAA*, 325 F.3d 320, 331 (D.C.Cir.2003)).  Any one of these factors militates for a deeper environmental review, the kind of comprehensive analysis that is done for an EIS.

The threatened surgeries clearly trigger the "controversial", "highly uncertain", and "unknown risks" factors, because the record demonstrates that existing medical research presents in detail the risks faced by mares receiving an ovariectomy via colpotomy.  This automatically triggers the need for an environmental impact statement under NEPA.

In a test of a similar surgical procedure (bilateral ovariectomy via colpotomy), five in twenty-three horses (roughly 22%) were reported to experience some problems after surgery. (AR-008152, AR-08197 (citing Hooper, R.N. et al., *Effects of bilateral ovariectomy via colpotomy in mares 23 cases* (1984-1990), J. Am. Vet. Med. Ass. 203, 1043-1046)).  Even today, in a controlled and well-tested clinical setting such as a veterinary hospital for *domestic* horses, it is widely acknowledged that ovariectomy via colpotomy has a significant potential for life-threatening complications.  In a traditional ovariectomy via colpotomy procedure, the surgery is performed "blindly" with the surgeon only able to palpate, but not visualize, the ovaries.  This

causes significant risk of injuring, tearing, or removing other structures, or of severing a blood vessel.  Intra-abdominal hemorrhage is a real and potentially lethal risk, and the blind nature of the procedure makes such hemorrhage difficult if not impossible to detect– at least until it may be too late.

Another identified risk is that, in reaching for the ovaries, the veterinarian may believe that other structures (*e.g.*, a ball of feces formed in the large intestine) are the mare's ovaries.  In that event, the veterinarian could cut open the intestines, guaranteeing spillage of feces into the abdominal cavity, with the inevitable consequence of fatal septic peritonitis – a painful and torturous death.  And without visualization, the potential exists for nearby blood vessels to be encircled by the snare end of the surgical tool used (the "ecraseur") which is intended to sever the ovaries for removal.

In addition to these devastating physical risks that are indisputable potential complications from this surgery, there are many potential negative consequences of the surgery to the wild horses' social and behavioral health.  Indeed, "[a]ny action taken to alter the reproductive capacity of an individual has the potential to affect hormone production and therefore behavioral interactions and ultimately population dynamics in unforeseen ways."  (AR-008197, citing Ransom, J.I et al. 2014).  Alarmingly, the health and behavioral effects of spaying wild horses that live with other wild horses is mostly unknown and not well documented – again directly invoking the CEQ factors that mandate an EIS.  The Agencies' employ of surgical sterilizations that could have irreparable impacts on the spayed horses' herd membership and family structures cannot be taken lightly or be allowed to be carried out without a careful review and analysis – which was not done here.  In essence the Agencies are committing these horses,

whom they are bound to protect, to be unwitting biomedical experimentation subjects.  This is far afield from any allowance of agency activity under the applicable statutes.

In the Proposed Action, besides authorizing this illegal research on wild horses, the USFS and BLM remain impermissibly vague about what, if any analysis will be conducted even after carrying out these irreversible changes to the Herds, saying only in passing that "[s]upplemental analysis of sterilization methods for this project would follow completion of the BLM's programmatic analysis."  (AR-008075).

## C.    Reasonable Alternatives Were Not Considered, in Violation of NEPA

As part of the Agencies' obligations under NEPA to make informed and careful considerations, they must consider alternative courses of action and conclude that their proposed action should be pursued based on comparative analysis.  "[A]n alternative is properly excluded from consideration . . . *only* if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'"  *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (emphasis added)).  Here, the USFS and BLM posit that there is a need to manage the wild horse and burro populations consistently across the Spring Mountain Complex to reduce environmental impacts, improve the ecological conditions, and move toward a "balanced distribution of animals."  (AR-008040).  That is understandable.  The Government also articulates a need to manage herd sizes so that wild horses and burros have year-long access to essential habitat components and can enjoy natural movement within each JMA.  (*Id.*)  That too, is within the Agencies' purview under the Wild Horse Act.  But – crucially – the USFS and BLM offer no satisfactory explanation for why taking an action as extreme as unproven and potentially fatal surgical research on the animals within these herds is the option to pursue over all alternatives.  In fact, on castration, the USFS and BLM acknowledge that studies support

sterilizing only dominant males "would result in only reduction in female fertility rates" and "would not provide the desired reduction … in overall population growth rate."  (AR-008203). So even with the suggested plans, the desired result would not be reached.  Yet the Agencies ignore their own conclusions and, in this action, will ask the Court to approve that arbitrary reasoning and failure to comply with their basic duties under the law.

Importantly, FRER does not challenge the Government's right under the Wild Horse Act to implement an HMA Plan or adjust the AMLs within the impacted JMAs.  FRER's discrete challenge concerns the Government's proposed plan to perform radical, invasive, permanent surgical sterilizations without sufficiently evaluating why much more humane, much more tested, much more accepted methods of fertility control on other wild horses and burros, namely the distribution of the PZP vaccine in liquid or pellet formulation, would fail to bring about the same end of controlling birth rates within the Herds.  The use of these less invasive methods would surely be in line with the Agencies' mandate to engage in the minimal feasible level of management and would satisfy the exact goals the Agencies claim they are satisfying with these impermissible surgeries.  And because the alternatives would at the same time honor the overriding policy behind the Wild Horse Act, which is to protect these animals that Congress has specifically identified for federal coverage, in any event the Agencies' current Plan violates the applicable federal statutes and must be vacated.

The USFS' and BLM's EA offers only one self-serving, false alternative to the Proposed Action, which is to do nothing, to take no action.  (AR-008052).  In this way, the Decisions artificially are reduced to authorizing everything proposed – which includes the objectionable surgical sterilizations – or nothing.  But the reasonable alternatives discussed in this brief, and in the AR, are not even considered.

The BLM has been challenged multiple times over its efforts to begin ovariectomy with colpotomy practices on wild horses, and each time the program has been aborted by the agency, usually after litigation has been filed or threatened.  Trying to avoid a recurrence of that scenario, the Government has tried to craft a program that can't be refused.  But the USFS and BLM appear to have conducted no analysis in support of why surgical sterilization should be chosen, as compared to other tools at their disposal in the management of these herds.  That is, the EA sets up a straw man that is easily knocked down ("all or nothing"), but the reasoning and selective identification of alternatives is in itself a failure to consider all alternatives – equally, and separately.  They point to no other HMA or herds of wild horses or burros that they have managed where they have employed such methods.  They present no relevant scientific support for their decision.  They ignore the dangers to those animals they are obligated to protect, and they seek authority to radically shift how they control for wild horse and burro populations without offering any support for why such a shift is needed or will better, or even equally, achieve the desired result, and given the extra risk to animal health and safety that it poses.  The extended discussion contained in Appendix I of the EA (AR 008169 – 008211) provides general descriptions for the PZP and GnRH vaccines and surgical sterilizations of spaying and gelding procedures.  No analysis is conducted to explain why for these Herds vaccines are insufficient and the USFS and BLM must also be afforded the authority to pursue the far more invasive, dangerous methods of surgical sterilization.

NEPA's purpose is to prevent governmental agencies from haphazardly taking actions with irreversible consequences without at bare minimum studying and analyzing the need for such actions in light of alternatives that would pose less environmental risks.  The Proposed

Action is a textbook example of a failure of that purpose and use of the tools required to carry it out.

**D.      The USFS and BLM Failed to Take a Hard Look as Required Under NEPA**

As previously discussed, the Proposed Action blanketly authorizes dangerous surgical sterilizations on an unchecked scale and scope that, if carried out, would mark a significant cumulative impact that should have warranted an EIS.  Under the Proposed Action, the USFS and BLM represent spaying and gelding surgeries as reliable, time-tested procedures -- but entirely gloss over how these surgeries almost exclusively have been performed on domestic animals ("The ovariectomy via colpotomy procedure has been conducted for over 100 years, normally on open (non-pregnant), *domestic* mares."  (AR-008194); "The effect of castration on aggression in horses has not been quantified.  One report has noted that high level of aggression continued to be observed in *domestic* horse geldings who also exhibited sexual behaviors" (*id.*)).

Indeed, research and study as to the consequences of these irreversible surgical alterations to wild horses and burros is scant – and frightening.  ("There are few peer reviewed studies documenting the effects of ovariectomy on the success of pregnancy in a mare" (AR-008195); "[T]here is some degree of uncertainty about the exact quantitative outcomes for any [gelded] individual" (AR-008292); "Despite livestock being managed by castrating males for millennia, there is relatively little published research on castrates' behaviors" (AR-008206)).

What *is known* is that these surgeries pose real risks to the health and wellbeing of the animals.  And even the small amount of research on castration and laparoscopic ovariectomies dwarfs the absence of any such reassurance with respect to ovariectomy via colpotomy.  ("Some level of minor complications after [castration] surgery may be expected" and "may include, but are not limited to minor bleeding, swelling, inflammation, edema, infection, peritonitis, hydrocele, penile damage, excessive hemorrhage, and eventration" (AR-008204); "Mortality due

20

to [ovariectomy via a flank laparoscopy] surgery, or post-surgical complications, is not expected, but it is a possibility." (AR-008194); risks of colpotomy: "pain and discomfort; injuries to the cervix, bladder, or a segment of bowel; delayed vaginal healing; eventration of the bowel; incisional site hematoma; intraabdominal adhesions to the vagina; and chronic lumbar or bilateral hind limb pain" (AR-008196)). Even accepting, as the USFS and BLM argue, that the likelihood of severe pain or mortality from post-surgical operations is low, that does not justify the risk, or the entry into the unknown (research) for these horses, given the Agencies' mandates with respect to wild horses and burros, when safer, non-permeant, affordable, proven vaccine alternatives are available for use.

It is insufficient for the USFS and BLM to simply plan on monitoring *some of* the effects of these irreversible surgeries *after the fact*. Being able to retroactively evaluate the impact of the Decisions for environmental impacts after the fact would "effectively gut the environmental safeguards that Congress enacted in . . . NEPA." *Envtl. Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 84-85 (D.D.C. 2007).

NEPA analysis and review must be done not to determine if the government has caused permanent harm to its resources (here, wild horses) but *before decisions are made and before actions are taken*. 40 C.F.R. § 1500.1(b). It bears repeating that "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

The USFS and BLM have not supported the decision to use surgical sterilization with analysis or study and this aspect of the Proposed Action is arbitrary and capricious and must be enjoined from taking place.

## VI.     CONCLUSION

For all the foregoing reasons, FRER moves the Court to grant summary judgement in its favor and seeks a declaration that Defendants violated the Wild Horse Act, NEPA, and the APA in issuing the Decisions authorizing the Proposed Action, specifically the surgical sterilization of wild horses and burros through ovariectomy via colpotomy.  FRER further requests that the Court enjoin the Defendants from carrying out any surgical sterilizations and that the Proposed Action, Final EA, Decisions, and FONISI be vacated and the matter remanded to the Agencies for further evaluation, especially of the female sterilization procedures.


Respectfully submitted April 17, 2023

/s/ Bruce A. Wagman
Bruce A. Wagman
Riley Safer Holmes & Cancila LLP
456 Montgomery St., 16th Fl.
San Francisco, CA 94104
bwagman@rshc-law.com
Telephone:     (415) 275-8540
Facsimile:      (415) 275-8551

*Attorney for Plaintiff*
*Front Range Equine Rescue*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, I caused the foregoing document to be filed using the Court's electronic filing system, which will send notice of this filing to all counsel of record.

*/s/ Bruce A. Wagman*