## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
FRONT RANGE EQUINE RESCUE,  )
            )
      Plaintiff,  )
            )
    v.        )  Civil Action No. 22-2471 (ABJ)
            )
TOM VILSACK      )
*in his official capacity as*   )
*Secretary of the U.S.*    )
*Department of Agriculture*, *et al.*, )
            )
      Defendants. )
————————————————————————)

## <u>MEMORANDUM OPINION</u>

Plaintiff Front Range Equine Rescue ("FRER") is a nonprofit group dedicated to protecting and preventing the abuse of wild and domestic horses through rescue and education. Compl. [Dkt. # 1] ¶¶ 7, 8. It brings this action against Tom Vilsack, in his official capacity as Secretary of the U.S. Department of Agriculture; Randy Moore, in his official capacity as Chief of the U.S. Forest Service ("USFS"); William Dunkelberger, in his official capacity as Forest Supervisor, Intermountain Region, USFS; Deb Haaland, in her official capacity as Secretary of the U.S. Department of the Interior; Tracy Stone Manning, in her official capacity as Director of the Bureau of Land Management ("BLM"); and Angelita Bulletts, in her official capacity as the District Manager, Southern Nevada District, BLM (collectively "Defendants"). Compl. ¶¶ 16–21. Plaintiff alleges that the decisions of the USFS and BLM to employ wild horse population suppression methods that include surgical sterilizations violate the Administrative Procedure Act ("APA"), 5 U.S.C § 702, the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Compl. ¶ 4.

Plaintiff has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Pl.'s Mot. for Summ. J. [Dkt. # 21] ("Pl.'s Mot.").  Defendants opposed the motion and filed a cross-motion for summary judgment, Defs.' Cross-Mot. for Summ. J. [Dkt. # 22] ("Defs.' Cross-Mot."), but in the motion, they also asked the Court to dismiss the case for lack of subject matter jurisdiction because plaintiff lacks standing.  Defs.' Mem. in Support of Defs.' Cross-Mot. ("Defs.' Mem.") [Dkt. #22-1] at 13–19.  The matter is fully briefed.  *See* Pl.'s Combined Opp. to Defs.' Mot. and Reply in Support of Pl.'s Mot. [Dkt. # 24] ("Pl.'s Reply"); Defs.' Reply in Support of Defs.' Mot. [Dkt. # 27] ("Defs.' Reply"); Defs.' Notice of Suppl. Authority [Dkt. # 29] ("Defs.' Suppl."); Pl.'s Resp. to Defs.' Suppl. [Dkt. # 30] ("Pl.'s Suppl. Resp."); Pl.'s Notice of Suppl. Authority [Dkt. # 31] ("Pl.'s Suppl.").

Because plaintiff lacks organizational standing, the Court will dismiss this action for lack of subject matter jurisdiction.

## BACKGROUND

### I.     Statutory Framework

### A.  The Wild Free-Roaming Horses and Burros Act

In 1971, Congress enacted the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act"), *see* 16 U.S.C. § 1331 *et seq*., declaring that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death," in recognition that such animals "contribute to the diversity of life forms within the Nation."  § 1331.  To accomplish this goal, Congress authorized the Secretary of Interior (through the BLM) and the Secretary of Agriculture (through the USFS) to manage unclaimed horses and burros on public lands in the United States. §§ 1332–33.

While the original Act provided – as it still does today – that "[a]ll management activities shall be at the minimal feasible level," *see* § 1333, by 1978, "Congress recognized that circumstances had changed." *Am. Horse Prot. Ass'n, Inc. v. Watt,* 694 F.2d 1310, 1316 (D.C. Cir. 1982). The situation "appear[ed] to have reversed, and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Id.*, quoting H.R. Rep. No. 95–1122, 95th Cong., 2d Sess. 23 (1978). Congress therefore amended the Act to balance "protecting wild horses and competing interests in the resources of the public ranges," and because "prompt action was needed to redress the imbalance that had developed; it directed that excess horses should be removed *expeditiously*." *Id.* (emphasis in original). The amendment empowered the Secretaries to remove "excess" horses "in order to preserve and maintain a thriving natural ecological balance" and sustain the land for multiple uses. *Id.*, quoting § 1332(f). The Act directed the Secretary to "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands," the purpose of which is to:

> [M]ake determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).

16 U.S.C. § 1333(b)(1). This section further specifies the information upon which the Secretary can make a determination that a horse overpopulation exists in a particular area, which includes: (i) the inventory of federal public land; (ii) land use plans; (iii) information from "court ordered environmental impact statements"; and (iv) "such additional information as becomes available to him from time to time, including that information developed in the research study mandated by this section." § 1333(b)(2). If, based on this information, "or in the absence of [this] information

[] [,] on the basis of all information currently available to him," the Secretary determines that "action is necessary to remove excess animals," the Act requires that he "immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.*

## B.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA") directs that federal agencies include, "to the fullest extent possible," a detailed "environmental impact statement" ("EIS") for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" describing the "reasonably foreseeable effects of the proposed agency action." *See* 42 U.S.C. § 4332(C); *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 15–16 (2008).  NEPA also established the Council of Environmental Quality ("CEQ"), which has the authority to interpret the statute and promulgate regulations to guide federal agencies in meeting its requirements.  42 U.S.C. § 4342; 40 C.F.R. § 1500.3.  The CEQ's regulations "allow an agency to prepare a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757 (2004), citing 40 C.F.R. § 1501.4(a)(b).  If the agency then determines through its EA that no EIS is required, then it "must issue a 'finding of no significant impact' (FONSI)" explaining "why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757–58, citing §§ 1501.4(e), 1508.13.

NEPA is "essentially procedural," *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978) (citations omitted), and "it is [] well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted).  The Court of Appeals has

therefore recognized that NEPA is "'not a suitable vehicle' for airing grievances about the substantive polices adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'"  *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015), quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987).

## II.    Factual Background

This case concerns wild horses located in the Spring Mountains Wild Horse and Burro Complex ("Complex") located in Nevada.  AR 8823.[1]  The Complex consists of approximately 784,325 acres of public lands within the Humboldt-Toiyabe National Forest in Clark and Nye Counties.  AR 9006.  In 1993, the BLM, as the designee of the Secretary of the Interior, and the USFS, as the designee of the Secretary of Agriculture, entered into an interagency agreement for lands within the Complex's three Joint Management Areas ("JMAs").  AR 1823.  Under the agreement, BLM had responsibility for the Red Rock and Johnnie JMAs and the USFS had responsibility for the Spring Mountain/Wheeler Pass Horse JMA.  AR 26–31, 9006, 9057.

On January 1, 2013, USFS and BLM posted a Proposed Action to implement a Herd Management Plan and Environmental Assessment ("EA") for the Complex that included appropriate management levels ("AMLs") of wild horses and burros for the entire Complex.  AR 1441–42.  In September 2021, they released a preliminary EA.  AR 8034.  On May 10, 2022, the BLM issued a "finding of no significant impact" ("FONSI"), setting forth its determination that Herd Management Area Plan would not have a significant impact on the environment and therefore did not require an EIS to be prepared.  AR 9185.  On August 2, 2022, BLM and USFS released the final EA at issue.  AR 9004.

---

1    The administrative record appears on the docket.  *See* Administrative R. [Dkt. # 28].  When referring to a document in the administrative record, the Court will use "AR" and the Bates number of the document.

The Final Environmental Assessment considered the current management levels, herd population estimates, and desired conditions to establish new AMLs for horses and burros in each management area, most of which would require a decrease in population.   AR 9006–13, 9057–9183.   The agencies proposed several mechanisms for suppressing population growth, including the use of contraception and surgical sterilization of the wild horses and burros. AR 9045–47.   The 179-page EA includes appendices on a gelding and fertility analysis; standard operating procedures for gathers, sterilization, and fertility treatments; utilization monitoring; and population modeling.   AR 9004, 9057–9183.   On August 2, 2022, the USFS issued its finding of no significant impact and the Decision Notice authorizing the Proposed Action.   AR 9052–56.

On August 18, 2022, plaintiff filed a three-count complaint in this Court.   Compl.   Count One alleges that defendants violated the APA because the agencies acted in an arbitrary and capricious manner in authorizing the Proposed Action of surgical sterilization.   Compl. ¶¶ 79–82. In Count Two, plaintiff claims that defendants violated the Wild Horses Act because they "failed to adequately consider less risky alternatives and the lasting and potentially dangerous impacts of surgical sterilization."   Compl. ¶¶ 83–91.   Count Three alleges a violation of NEPA because defendants did not conduct an environmental impact statement and "fail[ed] to adequately consider the impacts of surgical sterilization on the human environment."   Compl. ¶¶ 92–100.   Plaintiff seeks declaratory relief that defendants have violated the Wild Horses Act, NEPA, and the APA, and also seek to enjoin defendants from carrying out any aspect of the Proposed Action, order the return of any wild horse or burros that have been removed from the Spring Mountain HMA in accordance with the Proposed Action, and vacate the Proposed Action.   Compl. at 19–20.

Before the Court takes up any of these issues, though, it must ascertain whether it has Article III jurisdiction to hear them.

**LEGAL STANDARD**

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Moreover, a federal court must determine whether it has jurisdiction to hear a case before it may consider whether plaintiffs have stated a cognizable claim. *Hancock v. Urban Outfitters*, 830 F.3d 511, 513 (D.C. Cir. 2016) ("Federal courts cannot address the merits of a case until jurisdiction – the power to decide – is established.").

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).   Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms.*, *Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Even in the absence of a formal motion to dismiss under Rule 12(b)(1), "if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## ANALYSIS

"To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Standing is a necessary predicate to any exercise of federal jurisdiction; if it is lacking, then the dispute is not a proper case or controversy under the Constitution, and federal courts have no subject matter jurisdiction to decide the case.  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).  Plaintiffs must show standing for each claim they assert, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 185 (2000), and the party invoking federal jurisdiction bears the burden of establishing standing.  *Lujan*, 504 U.S. at 561.

To establish constitutional standing, plaintiffs must show:  (1) that they have suffered "injury-in-fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant;

and (3) that it is "likely, as opposed to merely speculative," that a favorable decision will redress the injury. *Lujan,* 504 U.S. at 560–61 (citations omitted); *see also Laidlaw Env't. Servs.*, 528 U.S. at 180–81.

To satisfy the first requirement, plaintiffs must demonstrate that they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), quoting *Lujan*, 504 U.S. at 560. To be "concrete," the injury "must actually exist," meaning that it is "'real' and not 'abstract,'" although concreteness is "not . . . necessarily synonymous with 'tangible.'" *Spokeo*, 578 U.S. at 339–42 (citations omitted). And to be "particularized," the injury must affect a plaintiff "in a personal and individual way." *Id.* at 339 (citations omitted). A "plaintiff raising only a generally available grievance about [the] government – claiming only harm to his and every citizen's interest in [the] proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74; *see also Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987) (observing that an injury-in-fact requires "more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered").

Like individual plaintiffs, an organizational plaintiff can establish standing if it can "show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch*, 808 F.3d at 919 (quotations and citation omitted). The concrete injury must be "more than [an abstract] frustration of [the organization's] purpose," *id*. (citation omitted), and must not be the result of the organization's "own budgetary choices." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1139 (D.C. Cir. 2011) (citation omitted). "The court has distinguished between organizations that allege that their

activities have been impeded from those that merely allege that their mission has been compromised." *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006), citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429–30 (D.C. Cir. 1996). The Court of Appeals has therefore established a two-pronged inquiry for a concrete organizational injury: 1) whether the action has "'injured the [organization's] interest,'" and 2) "whether the organization 'used its resources to counteract that harm.'" *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015), quoting *Equal Rts. Ctr.*, 633 F.3d at 1140.

To satisfy the first requirement, a sufficient injury must show "that the defendant's conduct perceptibly impaired the organization's ability to provide services," such as when its "daily operations" are inhibited. *Food & Water Watch*, 808 F.3d at 919, quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015); *PETA*, 797 F.3d at 1094, quoting *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986). This requires "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

Defendants contend that plaintiff has failed to satisfy both of these requirements for organizational standing, and that it "merely identifies government action contrary to its institutional objectives." Defs.' Mem. at 1319. Plaintiff responds that it has standing because the challenged decisions conflict with its core mission and goals and impair its ability to engage in daily programming. Pl.'s Reply at 5–6. It provides a declaration from its President and Founder, Hilary Wood, *see* Ex. 1 to Pl.'s Reply [Dkt. # 24-1] ("Wood Decl."), who asserts that the use of surgical sterilization is "antithetical to the mission of FRER to ensure humane treatment for wild horses and burros and will directly harm the organization's ability to further its mission." Wood Decl. ¶ 12. To this point, she states that "[o]ne of FRER's primary goals is to protect wild horses

on federal public lands" from "cruelty and abuse," which includes the "invasive and dangerous surgeries threated by the government." Wood Decl. ¶ 7. "While [the organization] would spend more money and resources" in pursuing this goal, Wood avers that FRER has been "forced to divert its resources for [its rehabilitation and educational] programs to respond to and keep the public informed about" the agency's actions. Wood Decl. ¶ 8.

The declarant's conclusory assertion that the organization's activities and operations have been compromised is not sufficient to carry plaintiff's burden, and the Court finds that plaintiff's claimed injury can only be characterized as a generalized objection – albeit one that is firmly and sincerely held – to a government policy.

First, plaintiffs have not shown that defendants' conduct has "perceptibly impaired the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919, quoting *Turlock*, 786 F.3d at 24. Plaintiff's declarant asserts that the organization's mission is to "reduc[e] cruelty and abuse of horses nationwide," and that it "engages in educational efforts" regarding responsible horse ownership and welfare issues. Wood Decl. ¶ 2. But "conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Nat'l Treasury Emps. Union*, 101 F.3d at 1429 (citations omitted); *see also Havens*, 455 U.S. at 379 (distinguishing injury to an "organization's activities," which would satisfy standing elements, from "a setback to the organization's abstract social interests").

Indeed, plaintiff's statement that defendants' sterilization plan is the "kind of inhumane treatment" that plaintiff seeks to minimize, Pl.'s Suppl. Resp. at 3, reveals that the gravamen of the complaint is the "pure issue-advocacy" that the Court of Appeals has expressly rejected for purposes of standing. *See, e.g., Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C.

11

Cir. 2005).  Plaintiff resists this conclusion and cites *PETA v. U.S. Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015), in which the D.C. Circuit did hold that an animal welfare group had standing to challenge an agency's action of excluding birds from regulations that required it to produce "inspection reports."  *Id.* at 1094–95.  But *PETA* is distinguishable.  In that case, PETA averred that: (1) one of its "primary" goals was to educate the public about the "inhumane treatment of animals used for entertainment"; (2) the agency's "inspections reports" were a "primary source of information" for its "educational materials"; and (3) the agency's failure to produce these reports about birds "frustrate[d]" its public education efforts.  *See id.* at 1096 (detailing the plaintiff's declaration in support of its standing).  Thus, the organization's injury was not solely based on the fact that the challenged action contravened its mission to "prevent cruelty and inhumane treatment of animals," but also the fact that the agency's actions "deprived PETA of key information that it relies on to educate the public."  *Id.* at 1094.

Here, while plaintiff asserts that the sterilization plan falls within the category of animal abuse it seeks to eradicate, the plan does not impair plaintiff's ability to continue to monitor wild horses and burros, nor does it deprive plaintiff of access to the animals at the heart of its mission and educational activities.  *See* Compl. ¶¶ 12–13.

Plaintiff has also failed to show that it used its resources to counteract the alleged harm. The organization's declarant states that its programming has suffered because it "has had to divert funding to advocate outside the courtroom against the exact actions proposed by the Decisions being challenged in the current lawsuit."  Wood Decl. ¶ 6.  She explains that the organization "would spend more money and resources on its rescue, rehabilitation programs, and educational pursuits, [but] it has been forced to divert its resources for those programs to respond to and keep the public informed about the illegal actions of the federal agencies that interact with wild horses."

Wood Decl. ¶ 8.  But as the D.C. Circuit put it, "our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."  *Food & Water Watch*, 808 F.3d at 919 (citations omitted); *see also id.* at 920 ("[A]n organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'"), quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).  The Supreme Court reiterated the point in *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024), when it said, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."

While plaintiff relies on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), to support its argument that a "consequent drain on the organization's resources" establishes standing, Pl.'s Reply at 4, the Supreme Court has taken pains to limit the scope of its decision in that case, emphasizing  that it "does not stand for the expansive theory that standing exists when an organization diverts its resources in response to a defendant's actions."  *All. for Hippocratic Med.*, 602 U.S. at 370 (further explaining that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context").[2]

---

2       *Havens* presented an entirely different set of circumstances:  a nonprofit housing counseling organization sought to bring a claim against a real estate service and an apartment complex owner who were intentionally providing plaintiffs with misinformation regarding apartment availability.  455 U.S. 363 at 368–69.  The court found this racial steering to be a "concrete and demonstrable injury to the organization's activities" that sufficiently injured the organization's interest in providing accurate housing counseling services and forced them to devote resources to counteracting the defendant's practices.  *Id.* at 379.

Plaintiff has failed to establish that its organizational activities have been perceptibly impaired, or that it has used its resources to counteract the alleged harm in any way beyond advocating against the defendants' conduct.  Therefore, plaintiff has not alleged the requisite injury to its interests to give rise to organizational standing, and Supreme Court and Circuit precedent compel a finding that the Court lacks jurisdiction to consider its claims. This ruling expresses no opinion, then, with respect to the merits of plaintiff's challenge to the agency's plan.

## CONCLUSION

Because plaintiff has failed to establish organizational standing, this action will be **DISMISSED** for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3).  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE:  October 11, 2024

14